2023-1169

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

AMARIN PHARMA, INC., AMARIN PHARMACEUTICALS IRELAND LIMITED, MOCHIDA PHARMACEUTICAL CO., LTD.,

*Plaintiffs-Appellants,*

v.

HIKMA PHARMACEUTICALS USA INC., HIKMA PHARMACEUTICALS PLC,

*Defendants-Appellees*,

HEALTH NET LLC,

*Defendant*

---

Appeal from the United States District Court for the District of Delaware
Case No. 1:20-cv-01630-RGA-JLH, Judge Richard G. Andrews

---

## APPELLANTS' REPLY BRIEF

---

Nathan K. Kelley
Nathanael D. Andrews
PERKINS COIE LLP
700 13th Street NW, Suite 800
Washington, D.C. 20005
Phone: (202) 654-3343
E-mail: NKelley@perkinscoie.com

*Counsel for Amarin Pharma, Inc., Amarin Pharmaceuticals Ireland Ltd., and Mochida Pharmaceutical Co., Ltd.*

July 12, 2023

## TABLE OF CONTENTS

Table of Authorities ........ ii

Table of Abbreviations and Conventions ........ iv

Introduction ........ 1

Argument ........ 3

I. Hikma cannot defend the district court by distorting precedent or the district court's analysis ........ 3

  A. Specific "instructions" are not necessary to establish induced infringement ........ 3

  B. The district court's decision was not about the plausibility of Hikma's intent to induce ........ 7

  C. Amarin's label arguments were not about missing information nor were they the focus of this appeal ........ 8

II. The district court erred when it ignored the plausibility pleading standard ........ 10

  A. Hikma, like the district court, demands too much at the pleading stage ........ 11

  B. Hikma's case law arguments fail to address the district court's errors and confirm that dismissal was improper ........ 16

III. This is neither a "test case" nor an attempt to "expand" *GSK* ........ 20

Conclusion ........ 23

Certificate of Compliance

# TABLE OF AUTHORITIES

**Cases** **Pages**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........10, 11

*AstraZeneca LP v. Apotex, Inc.*,
633 F.3d 1042 (Fed. Cir. 2010)..........7, 16

*Bayer Schering Pharma AG v. Lupin, Ltd.*,
676 F.3d 1316 (Fed. Cir. 2012)..........17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........10, 11

*Cal. Beach Co., LLC v. Exqline, Inc.*,
No. 20-01994-WHA, 2020 WL 6544457 (N.D. Cal. Nov. 7, 2020)..........17, 18

*DSU Med. Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006)..........4, 7

*Eli Lilly and Co. v. Teva Parenteral Meds., Inc.*,
845 F.3d 1357 (Fed. Cir. 2017)..........4, 17

*Ferring Pharms. Inc. v. Lupin Inc.*,
No. 1:19-cv-913-RGA, 2020 WL 3414750 (D. Del. June 22, 2020)..........17, 18

*Fromberg, Inc. v. Thornhill*,
315 F.2d 407 (5th Cir. 1963)..........5

*GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*,
7 F.4th 1320 (Fed. Cir. 2021)..........9, 21

*HZNP Meds. LLC v. Actavis Labs. UT, Inc.*,
940 F.3d 680 (Fed. Cir. 2019)..........7, 17

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
420 F.3d 1369 (Fed. Cir. 2005)..........8

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005)..........4, 6, 7

*Ricoh Co., Ltd. v. Quanta Comput. Inc.*,
550 F.3d 1325 (Fed. Cir. 2008) ....................................................................5

*Scheuer v. Rhodes*,
416 U.S. 232 (1974)....................................................................................10

*Takeda Pharms. U.S.A., Inc. v. West-Ward Pharm. Corp.*,
785 F.3d 625 (Fed. Cir. 2015) .............................................................4, 19

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) ....................................................................5

*Tegal Corp. v. Tokyo Electron Co., Ltd.*,
248 F.3d 1376 (Fed. Cir. 2001) ....................................................................5

*Warner-Lambert Co. v. Apotex Corp.*,
316 F.3d 1348 (Fed. Cir. 2003) ...........................................................18, 19

**Statutes** **Pages**

35 U.S.C. § 271(b) ..............................................................................................5

35 U.S.C. § 271(e)(2)(A) ...................................................................................18

**Rules** **Pages**

Fed. R. Civ. P. 12(b)(6)........................................................................................5

# TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| ’537 patent | U.S. Patent No. 9,700,537 |
| ’861 patent | U.S. Patent No. 10,568,861 |
| AAMBr. | Amicus Brief filed by Association for Accessible Medicines |
| Appx____ | joint appendix page ____ |
| Amarin | plaintiffs–appellants Amarin Pharma, Inc., Amarin Pharmaceuticals Ireland Ltd., and Mochida Pharmaceutical Co., Ltd., collectively |
| BB__ | Amarin’s opening brief, page __ |
| CV | cardiovascular |
| EPA | icosapentaenoic acid |
| FAC | Amarin’s First Amended Complaint, Appx504-557 |
| Hikma | defendants–appellees Hikma Pharmaceuticals USA Inc. and Hikma Pharmaceuticals PLC, collectively |
| HTG | hypertriglyceridemia |
| RB__ | Hikma’s response brief, page __ |

## INTRODUCTION

Beyond trying to reframe this case by distorting Amarin's appeal, Hikma does little to counter Amarin's core argument. This is a pleadings case and Amarin pled a plausible claim of induced infringement. Amarin demonstrated the efficacy of and brought to market a revolutionary treatment—in the drug Vascepa®—for patients with hypertriglyceridemia that reduces cardiovascular risk, i.e., the CV indication. That indication was distinct from Vascepa's other indication limited to treating patients with *severe* hypertriglyceridemia, where the primary concern is pancreatitis. Hikma sought FDA approval to produce a generic version of Vascepa with an asserted "skinny" label limited to the severe hypertriglyceridemia indication. Hikma then encouraged prescribing healthcare providers, through multiple suggestions, to substitute Hikma's generic for *both* indications of Vascepa. Hikma knew that most prescriptions for Vascepa were for reducing cardiovascular risk in patients with hypertriglyceridemia rather than for treating severe hypertriglyceridemia.

Amarin's inducement theory is not complicated: Hikma's multiple communications taken together encouraged healthcare providers to prescribe its generic drug for an off-label and patented use. Amarin's factual allegations should be weighed together against the threshold for induced infringement, i.e., each of Hikma's actions should be given an appropriate weight and the sum of those actions weighed against the inducement threshold. The district court erred by, among other

things, weighing each piece of evidence separately. Even if each suggestion by itself was insufficient to plausibly demonstrate that Hikma encouraged healthcare providers to use its generic for the patented CV indication, the combined series of communications was sufficient to demonstrate encouragement when weighed together. That allegation is at least plausible at the pleadings stage. But the district court did not consider the evidence collectively as Amarin pled, and Hikma repeats the error by isolating Amarin's allegations and ignoring the low plausibility standard for assessing the sufficiency of Amarin's pleading.

In response to Amarin's argument that Hikma's website, press releases, and label together encouraged physicians to prescribe an infringing use, Hikma has little to say. Even then, Hikma ignores the pleading standard—essentially arguing that Amarin had to prove its induced infringement claim in its complaint. After turning its back on Amarin's arguments and the pleading standard, Hikma proceeds to twist the law on induced infringement when it argues that Amarin must show a single, isolated instruction to support its induced infringement claim. Precedent does not support Hikma's assertion that inducement can only be encouraged through an isolated "instruction." Hikma made multiple suggestions to healthcare providers plausibly encouraging them to use Hikma's generic for the patented, off-label CV indication. Amarin has explained why and how it satisfied the plausibility pleading standard. Hikma has failed to explain why Amarin's theory is implausible.

## ARGUMENT

### I. Hikma cannot defend the district court by distorting precedent or the district court's analysis

Rather than defend the district court's approach, which dismembered Amarin's theory and weighed each pled fact separately against the inducement threshold, Hikma dwells on its incorrect views of the law, the district court's analysis, and Amarin's argument on appeal. Hikma only spends about two superficial pages on Amarin's actual argument. RB40-42.

#### A. Specific "instructions" are not necessary to establish induced infringement

Hikma frequently returns to the same refrain: it supposedly did not *instruct* practicing the CV indication. RB4 (observing that Amarin did not argue Hikma's indication was "an instruction" to practice the CV indication); RB6 (arguing that its public statements "contain no instructions that actively encourage infringement"); RB7 (stating that neither its label nor its statements "instruct using the product" for the CV indication); RB21 (arguing that "Amarin points to no instructions in Hikma's label that plausibly induces infringement"); RB22 (stating that "the key issue here is the absence of any instruction"); RB32 (arguing that none of its cited public statements "amount to instructions at all"); RB33 (asserting that its reference to the broad category of "Hypertriglyceridemia" "is not an 'instruction'"); RB35 (same); RB41 (stating that "this Court has repeatedly required an ***instruction***"); RB43

(faulting Amarin's allegations for not relying "on any instructions"); RB44 ("Amarin does not point to an instruction to support its inducement allegations.") Contrary to Hikma's ubiquitous reference to instructions, induced infringement does not require that the inducer "instruct" the infringer.

This Court has articulated the types of evidence that can demonstrate inducement in various ways. While there must be "active steps" taken to encourage direct infringement, those steps need not amount to specific instructions. *See Takeda Pharms. U.S.A., Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 630-31 (Fed. Cir. 2015) (explaining that evidence of active steps taken to encourage infringement can include advertising *or* instructions) (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005)). Even when the evidence of inducement is limited to the label itself—which, to be clear, is not the case here—inducement can be found where the label encourages, recommends, or promotes infringement. *Eli Lilly and Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1368 (Fed. Cir. 2017) (citing *Takeda*, 758 F.3d at 631). As Amarin explained in its opening brief, the inducement inquiry turns on whether the generic manufacturer offered a product "'with the object of promoting its use to infringe, as shown by clear expression of other affirmative steps taken to foster infringement.'" BB29-30 (quoting *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305-06 (Fed. Cir. 2006) (en banc in relevant part)).

Hikma's narrow focus on "instructions" leads it to misunderstand the meaning of "active steps" taken to encourage infringement. Hikma argues that without "instructions," the required active steps were missing. RB43 (arguing that Amarin's allegations "do not rely on any instructions" and concluding that where "the patentee failed to plausibly allege any active steps to encourage infringement, non-infringement is decided as a matter of law") (citing Fed. R. Civ. P. 12(b)(6) and unidentified cases "cited *infra*"). Hikma is mistaken. The requirement for an "active step" as part of an induced-infringement allegation comes from the statutory language "[w]however actively induces," and it eliminates accusations of inducement based on *inaction*. 35 U.S.C. § 271(b); *Tegal Corp. v. Tokyo Electron Co., Ltd.*, 248 F.3d 1376, 1379 (Fed. Cir. 2001). But beyond eliminating inaction as a basis for indued infringement, there is no particular type of action required, so long as there is an affirmative act "of some kind." *Tegal*, 248 F.3d at 1378-79 (citing *Fromberg, Inc. v. Thornhill*, 315 F.2d 407, 411 (5th Cir. 1963) ("[T]he term is as broad as the range of actions by which one in fact causes, or urges, or encourages, or aids another to infringe a patent")). *See also TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1290 (Fed. Cir. 2020) (approving jury instruction contrasting "an affirmative act to encourage infringement" with "[e]vidence of mere inaction"). This Court has thus explained that statements and advertising can suffice as qualifying affirmative acts. *Ricoh Co., Ltd. v. Quanta Comput. Inc.*, 550 F.3d 1325, 1341 (Fed. Cir. 2008)

(discussing *Grokster*, 545 U.S. at 938). Hikma's statements on its website and in its press releases were not mere inaction. They were affirmative acts through which Hikma, according to Amarin's pleadings, encouraged direct infringement. Appx533 (FAC, ¶¶ 127-129).

Hikma exploits its narrow focus on "instructions" to distinguish evidence without regard to its effect on the healthcare providers who might prescribe Hikma's generic drug to treat cardiovascular risk in patients suffering from hypertriglyceridemia. According to Hikma, "Amarin does not plausibly allege that merely mentioning the therapeutic category 'Hypertriglyceridemia' constitutes an instruction." RB34. Hikma ignores what Amarin pled: "[A] healthcare provider *with knowledge of the significance of FDA approving VASCEPA® for the CV Indication*, and [Hikma's press releases, its website, and its label,] will inevitably practice at least the methods [of] the '537 and '861 patents by administering [EPA] to at least some patients with the characteristics required … including for a period effective to reduce risk of cardiovascular death." Appx535-536 ¶ 133 (emphasis added).

What these cumulative communications would encourage a healthcare provider to do—i.e., whether they would provide enough suggestions to induce infringement—is a factual inquiry. To be clear, Amarin's theory is not that Hikma's label by itself induced infringement. Rather, Amarin's theory is that the combination of the label and multiple communications by Hikma plausibly encouraged

infringement. Hikma took active steps to communicate through its website, press releases, and other statements. Whether those communications *actually* encouraged healthcare providers to infringe Amarin's patents by prescribing Hikma's generic to patients with hypertriglyceridemia for reduction of cardiovascular risk is a question of fact that cannot be resolved on the pleadings.

### B. The district court's decision was not about the plausibility of Hikma's intent to induce

Throughout its brief, Hikma discusses the requirement that a patentee must demonstrate that the inducer had the intent to cause direct infringement. RB24 (citing *DSU*, 471 F.3d at 1306); RB25 (discussing the dual requirements of intent to cause, and encouragement of, direct infringement) (citing *Grokster*, 545 U.S. at 936); RB26 (arguing that "intent to induce infringement" cannot be inferred where a product has substantial non-infringing uses) (citing *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1059 (Fed. Cir. 2010); RB35 (arguing that intent to induce cannot be shown with a statement that did not require practicing a claimed step) (citing *HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 702 (Fed. Cir. 2019); RB45 (quoting the Court's agreement with the district court in *HZNP* about a lack of dispute that the label instructions in that case did "not reflect specific intent to induce").

Hikma's arguments about intent ignore the basis of the district court's decision, which was not about the sufficiency of Amarin's pleadings regarding

intent. The district understood induced infringement requires: (*i*) direct infringement; (*ii*) knowing inducement; and (*iii*) intent to encourage another's infringement. Appx3 (citing *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005)). The district court focused on that second component, knowing inducement, and not a failure to plausibly plead either that there was direct infringement or that Hikma intended to encourage that infringement. The district court specifically acknowledged the potential relevance of Hikma's press releases to the intent issue, and it further explained that Hikma's references to total Vascepa sales "go to Hikma's intent to induce." Appx8. But as the district court explained, "[i]ntent alone is not enough; Amarin must plead an inducing act." *Id.* Amarin plausibly pled that Hikma intended to encourage infringement, and the district court did not conclude otherwise.

### C. Amarin's label arguments were not about missing information nor were they the focus of this appeal

Amarin's label argument was not primarily about absences of language as Hikma argues. RB27. Rather, Amarin demonstrated how Hikma's skinny label identifies patients where prescribing Hikma's generic would infringe Amarin's patent, identifies side-effects particular to the group of CV indication patients, and communicates an infringing use by excluding an expected disclaimer on all other drugs in the category. Amarin does not argue for a new legal standard for skinny-label induced infringement. Instead, Amarin argues that identifying off-label,

infringing uses on an allegedly skinny label is some evidence that can be combined under specific factual circumstances with additional extra-label evidence to show induced infringement. *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1335 (Fed. Cir. 2021) ("*GSK*"), *cert. denied*, --- S.Ct. ----, 2023 WL 3440748 (May 15, 2023).[1] Moreover, Amarin is not relying on the label evidence on its own to demonstrate induced infringement in this case; it is arguing that the label evidence is among the evidence supporting Amarin's plausible allegations. And even if the label evidence did not support Amarin's allegations at all, it remains plausible that Hikma's additional communications would have encouraged the off-label use of Hikma's generic version of Vascepa for the latter's CV indication.

[1] Hikma also suggests that the district court's departure from the magistrate's decision was motivated by the timing of this Court's *GSK* decision. RB18 (pointing out the timing of *GSK* relative to the magistrate's decision and adding that "[u]nder this new precedent" the district court rejected Amarin's arguments about Hikma's label). To the contrary, the district court did not reject the magistrate's analysis because of *GSK*, it *distinguished GSK*. Appx9 (discussing *GSK* and concluding that "[t]his case is more like *Grunenthal*"). Regardless of whether the district court correctly distinguished *GSK*, it did not conclude that Amarin's complaint was foreclosed by *GSK*.

## II. The district court erred when it ignored the plausibility pleading standard

This case was dismissed on the pleadings. The district court misapplied the plausibility pleading standard by isolating and weighing individual pled facts against the standard for induced infringement. As Amarin explained in its opening brief, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." BB27 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotations omitted). A claim is plausible when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The plausibility requirement is not a "probability requirement." *Twombly*, 550 U.S. at 556. "[I]t simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" showing the alleged misconduct. *Id*. "[A] well pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id*. (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The plausibility pleading standard governs here, but Hikma and the district court focused on whether Amarin's allegations proved induced infringement rather than stated a plausible claim.

### A. Hikma, like the district court, demands too much at the pleading stage

Under Hikma's view of the pleading standard, a plaintiff would be required to conclusively prove all the elements of its case in its very first filing. That is not the law. This is not an *inter partes* review where a petitioner's case-in-chief must be made out in the initial filing. This case is about the sufficiency of Amarin's pleadings, yet Hikma barely mentions the relevant caselaw regarding that standard. RB23 (Hikma's Standard of Review section) (citing, *inter alia*, *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678). Instead, Hikma's arguments focus on whether Amarin's complaint proved its case, and it relegates the issue of plausibility to a closing remark. RB47-48 (concluding that, "[i]n sum," Amarin's factual allegations did not cross "the line from conceivable to plausible.") (quoting *Twombly*, 550 U.S. at 570). Beyond that conclusion, Hikma does not explain *why* Amarin's allegations were implausible. In truth, there was nothing implausible about them.

Hikma's website announced that its generic version of Vascepa was in the Therapeutic Category of "Hypertriglyceridemia." Appx532 (FAC, ¶125) (citing Appx820; Exhibit T to FAC). That category does not match Hikma's label, which includes only the severe hypertriglyceridemia indication (i.e., triglycerides ≥ 500 mg/dL). Hypertriglyceridemia is broader than the severe hypertriglyceridemia authorized on Hikma's label. It is not implausible that a physician reading that website would be encouraged to prescribe Hikma's generic version for the only

approved Vascepa indication relevant to patients with hypertriglyceridemia, i.e., the patented CV indication for which Hikma's generic version was not approved. Hikma does not deny that a physician would be aware of both indications, it does not deny that only the patented indication is relevant to patients with non-severe hypertriglyceridemia, and it does not deny that an asserted claim is squarely directed to that patient population. Instead, Hikma's argument is that treating hypertriglyceridemia is distinct from treating cardiovascular risk. RB33. That is beside the point. Amarin's allegation was not that the website encouraged the treatment of hypertriglyceridemia, though Hikma seems to be admitting that it might. Amarin instead alleged that the website, together with other evidence, encourages healthcare providers to administer Hikma's generic version as they would administer Vascepa, i.e., "to reduce the risk of CV events." Appx533 (FAC, ¶128).

And Hikma's attempt to muddy this point by arguing Amarin failed to plead cardiovascular risk reduction as required by the claims, RB33-35, is inaccurate. Amarin pled that "a healthcare provider with knowledge of the significance of FDA approving VASCEPA® for the CV Indication, and [Hikma's press releases, its website, and its label,] will inevitably practice at least the methods [of] the '537 and '861 patents by administering [EPA] to at least some patients with the characteristics required … including for a period *effective to reduce risk of cardiovascular death*."

Appx535-536 (FAC, ¶ 133) (emphasis added); *see* Appx530-533 (FAC, ¶¶ 115, 122, 126-127). Hikma's inaccurate and distorted defense ignores Amarin's argument that prescribing Hikma's generic to the hypertriglyceridemia patient population currently taking a statin, a large group of patients, would necessarily lead to reduced CV risk and patent infringement. BB3; BB6 ("the primary concern for patients with HTG and elevated LDL cholesterol levels is cardiovascular risk reduction.") (citing Appx866); BB8 ("the FDA approved Vascepa® for a second indication: as a treatment to reduce cardiovascular risk in patients with HTG"); BB14 ("Treating patients having *severe* HTG—the approved indication—means treating patients with triglyceride levels of at least 500 mg/dL. But 'hypertriglyceridemia,' i.e., HTG, as opposed to severe HTG, generally refers to patients having triglycerides of over 150 mg/dL who are at increased cardiovascular risk—the very patients studied in the REDUCE-IT trial for cardiovascular risk reduction."); BB24 ("Hikma listed a broader general HTG therapeutic category where the majority of prescriptions would be for the patented use to reduce cardiovascular risk"); BB31 ("That broad category exceeds Hikma's authorized use to treat *severe* HTG in patients with triglyceride levels above 500 mg/dL because it includes the unauthorized, patented use to reduce cardiovascular risk in patients with triglyceride levels above 150 mg/dL, i.e., patients who suffer from HTG (where the primary concern is cardiovascular risk reduction) but not *severe* HTG (where the primary concern is pancreatitis)."). In other words,

Amarin's patent covers treating patients with hypertriglyceridemia to reduce cardiovascular risk while Hikma's narrow indicated use is limited to patients with severe hypertriglyceridemia. The purpose of treating patients with hypertriglyceridemia is to reduce CV risk, the indication Hikma supposedly carved out.

To support a false distinction that Amarin failed to plead CV risk reduction, Hikma references Amarin's discussion of the FDA's changed position for showing efficacy. RB33. But Amarin subsequently demonstrated CV risk reduction through clinical trials for patients with hypertriglyceridemia. BB7-8. Thus, although it is true that the FDA determined reducing triglyceride levels and reducing CV risk were not perfectly equivalent for the FDA's approval review, that point is irrelevant here because Amarin demonstrated that Vascepa—and hence Hikma's generic copy—does both. What matters is that Hikma attempted to carve out the indication directed to the broader patient population of hypertriglyceridemia where CV risk is the primary concern; Hikma's generic is only approved for treatment of the subset patient population with *severe* hypertriglyceridemia. Hikma's website identified the very patient population that Hikma supposedly removed from its label, the broader patient population for which the CV risk-reduction treatment was covered by Amarin's patent.

Furthermore, as Amarin explained in its opening brief, BB15, Hikma's pre-launch press releases made clear that Vascepa was indicated for more than one use, that its own product was the generic version of Vascepa, that it was working with the FDA to gain approval for its generic version of Vascepa, and that US sales of Vascepa were approximately $1 billion per year. Appx709-710; Appx712-713. There is no dispute that Hikma understood that most of those sales (75-86%) were for the patented CV Indication. BB16 (citing Appx803). It was at least plausible that a healthcare provider reading those press releases, aware of both approved indications, and aware that most Vascepa prescriptions were for the CV Indication, would be encouraged to prescribe Hikma's generic version for Vascepa's most common use, the CV Indication, once it was approved. In response, Hikma argues that it "was under no obligation to affirmatively discourage infringement." RB38. Again, that is beside the point. *If* those press releases *had* affirmatively discouraged infringement, it might have been less plausible that they encouraged infringement. But Amarin relied on them for what they said, not for their silence. Appx533 ¶¶ 127, 128; Appx535-536 ¶ 133.

Contrary to Hikma's arguments, RB38, Amarin has acknowledged language in Hikma's third press release mentioning that its generic was only approved for treating severe hypertriglyceridemia. BB16-17 (explaining that, by then, Hikma had primed the market with its earlier press releases). Whether the language in that third

press release would have altered the message conveyed collectively by all of Hikma's various communications is a question of fact. Regardless, it does not demonstrate that Amarin's reliance on the first two press releases was not plausible.

### B. Hikma's case law arguments fail to address the district court's errors and confirm that dismissal was improper

Rather than assessing Amarin's theory and its plausibility in view of all the pled factual allegations, the district court isolated each of Hikma's multiple suggestions and undertook an impermissible, isolated weighing of each against the standard for induced infringement. Hikma fails to defend this error, and the case law it relies on only confirms that dismissal at the pleadings stage was improper. Hikma asserts that "[t]his case is … weaker," RB20, than the other cases it cites, but Hikma's attempt just illustrates Amarin's argument: the other cases Hikma cites were label-only inducement cases and, even then, most went beyond the motion-to-dismiss stage. Thus, while Hikma cites *AstraZeneca*, *Eli Lilly*, *Bayer*, and *HZNP*, RB45, none of those cases help its cause.

*AstraZeneca* supports Amarin's argument that a label plus additional evidence can cumulatively show encouragement. *AstraZeneca*, 633 F.3d at 1057, 1059-60. Confusingly, Hikma says this is a "true skinny label" case, RB31, but Amarin argued precisely the opposite: that most of the evidence encouraging infringement here are extra-label suggestions from Hikma's website and press releases. BB2 ("[T]his is not a true skinny-label case. Amarin's allegations are based not just on Hikma's

label, but on its public statements made in press releases and on its website that encouraged physicians to prescribe Hikma's generic drug for an off-label use patented by Amarin.").

*HZNP* was a label-only case that did not instruct all the elements of the claims, but it still was not dismissed on the pleadings. *HZNP*, 940 F.3d at 702. *Bayer* was not a skinny-label case at all—the brand and generic labels were identical—and there was no inducement of an FDA approved use. *Bayer Schering Pharma AG v. Lupin, Ltd.*, 676 F.3d 1316, 1321 (Fed. Cir. 2012). *Eli Lilly* was also not a skinny-label case—the parties there agreed the labels were materially the same for purposes of induced infringement. 845 F.3d at 1362, 1364. Not only did that case go to trial and result in a judgment of induced infringement that was affirmed by this Court, *id*. at 1357, the evidence in question was distinct from this case because it relied on "unambiguous" instructions on the label without any details about extra-label communications or encouragement, *id*. at 1369.

Hikma also relies on *Cal. Beach Co., LLC v. Exqline, Inc.*, No. 20-01994-WHA, 2020 WL 6544457 (N.D. Cal. Nov. 7, 2020) and *Ferring Pharms. Inc. v. Lupin Inc.*, No. 1:19-cv-913-RGA, 2020 WL 3414750 (D. Del. June 22, 2020) for the proposition that induced infringement claims can be dismissed at the pleading stage. RB45-46. But Amarin does not dispute that dismissals can be appropriate for implausible induced infringement claims. Amarin argues instead that the specific

allegations and facts pled here stated a plausible claim. Thus, *Exqline* and *Ferring* are inapplicable. *Exqline* is a design patent case addressing "children's playpens" and has nothing to do with skinny-label inducement pleading. 2020 WL 6544457, at *1. *Ferring* is a label-only ANDA case with no section viii carve-out where the label provided instructions that were inconsistent with an asserted method claim. 2020 WL 3414750, at *1-4.

All of these label-only cases—other than *AstraZeneca*, which supports Amarin's arguments—are materially different from Amarin's allegations here because Amarin has relied on a series of communications beyond Hikma's label that plausibly encouraged physicians to prescribe Hikma's generic as a replacement of Vascepa for infringing treatment of the CV indication.

Hikma's reference to *Warner-Lambert*, RB49, confirms its mistaken focus on the ultimate questions of infringement—and specifically the wrong kind of infringement—rather than the pleading standard. Again, *Warner-Lambert* was a case that proceeded past the pleading stage to summary judgment. *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1351 (Fed. Cir. 2003). Hikma cites to the portion of the opinion discussing infringement via filing of an ANDA under 35 U.S.C. § 271(e)(2), RB49 (citing *id*. at 1359), rather than induced infringement, and it fails to note the distinction that the alleged infringing use was not an FDA approved indication, *Warner-Lambert*, 316 F.3d at 1354-55. But more relevant here, from its

discussion of induced infringement, *Warner-Lambert* made clear the insufficient evidence of inducement was all about "mere knowledge" and the possibility of infringement without any alleged communication or encouragement. 316 F.3d at 1364. Unlike Amarin's pleading here, the court in *Warner-Lambert* concluded, "*In the absence of any evidence that [the defendant] has or will promote or encourage doctors to infringe* the … patent, there has been raised no genuine issue of material fact. *Id*. (emphasis added).

Finally, Hikma's explanation that *Takeda* survived the motion to dismiss because of its "oral statements," RB46-47, is just another example of Hikma avoiding Amarin's argument. The question is whether it was plausible that Hikma's series of suggestions—through its website, press releases, and label—would encourage a healthcare provider to prescribe Hikma's generic version of Vascepa for the supposedly carved-out CV indication. Although the contents of the various public statements may not be in dispute, the extent to which this series of suggestions would have encouraged a prescribing healthcare provider to substitute Hikma's generic for Amarin's Vascepa is in dispute. Thus, although *Takeda* is different as to the specific evidence that was disputed, the principle is the same in that the dispute concerned what was communicated to prescribing healthcare providers. And as previously argued, BB48, *Takeda* lacked extra-label evidence showing promotion or encouragement and still survived the pleadings stage. *Takeda*, 785 F.3d at 632.

### III. This is neither a "test case" nor an attempt to "expand" *GSK*

Hikma's rhetoric about this being a "test case," RB48, or an attempt to "expand" the holding in *GSK* (RB3, 22, and 51), is a transparent attempt to convince this Court there is more here than a routine debate about the sufficiency of Amarin's pleadings. Amicus tries the same thing when it argues that a decision in Amarin's favor would "threaten[] the existence" of the paragraph viii carve-out and "open the flood gates to relentless—and often baseless—induced infringement actions against *any* generic with a section viii carve-out." AAMBr.2. Those alarmist warnings are untethered to the circumstances of this case and Amarin's arguments to this Court.

This case is not about "any" generic with a carve-out, it is about Hikma's carve-out, its website, its press-releases, and the statements it made in the earlier litigation. Hikma's actions in this case are not simply the innocuous actions required of any generic seeking to market a drug with a skinny label. Hikma's website associated its drug with a patient population far beyond the population relevant to the permitted use—and squarely situated in the infringing use. Its press releases noted the revenue associated with uses for which its drug would not be approved. And its statements in the earlier litigation established that it understood the connection between the CV indication and the commercial success of Vascepa.

This is not a drastic expansion of *GSK*. It is a request for the correct application of the pleading standard. *GSK* was a "narrow, case-specific review of

substantial evidence." *GSK*, 7 F.4th at 1326. Amarin is simply arguing that it should be allowed to look at the case-specific evidence here to investigate the factual issue of what Hikma's series of suggestions communicated to prescribing physicians. Far from a radical departure, Amarin relies on *GSK* for its holding that extra-label evidence can be combined with label evidence in some cases to support induced infringement. *Id*. at 1335; *see* BB40-43. Amarin does not argue that its label is the same as in *GSK*, that label evidence always must survive a motion to dismiss, or any such thing. Amarin argues that *GSK* supports the proposition that a label that fails to fully carve-out a patented indication can be some evidence of encouragement for induced infringement. *GSK*, 7 F.4th at 1334-35. Here, the label evidence is only part of Hikma's multiple suggestions to prescribing healthcare providers. Amarin's allegations are case specific, factually focused, and go beyond Hikma's label.

For its part, AAM's brief is largely about the value of section viii carve outs and the harms it says would flow from a regime in which "[a]ll generics facing unexpired patents will either need to wait until those patents expire or engage in costly, time-consuming litigation." AAMBr.7. But like many of Hikma's arguments, AAM's concerns are built on mischaracterizations of this case. AAM warns that "the omission of a condition of use in labeling, combined with statements of generic equivalence, simply cannot be enough to support induced infringement." AAMBr.3. That ignores much of what Amarin plead in this case. AAM does not acknowledge

Hikma's website, its press releases, and the statements it made in the earlier litigation. Contrary to AAM's superficial suggestion, Hikma did not "merely state[] that [its] product is a 'generic equivalent.'" *Id.* Hikma said more than that, more than once.

Amarin does not challenge the value of section viii carve-outs. Amarin argues it is plausible that Hikma's multiple suggestions provided to prescribing physicians, taken together, formed an encouragement to substitute Hikma's generic for Vascepa for the patented use that Hikma disclaimed. Even setting the evidence of Hikma's improper label aside, Amarin pled multiple communications that should be considered together. Amarin is not arguing for an expansion of *GSK* but for an opportunity to develop the specific factual question of what Hikma's conduct communicated. Permitting Amarin's complaint to survive beyond the pleading stage will not force generics to avoid section viii carve-outs. But if a complaint like Amarin's alleging extra-label communications can be dismissed on the pleadings, such suggestions to prescribing healthcare providers that a skinny-label generic should be used to replace the brand-name drug for off-label uses would likely become more prevalent.

While an amicus brief can shed light on issues or provide an additional perspective, it is no help to this Court to ignore the very question before it, which is whether Amarin plausibly pled its case for induced infringement based, in part, on

Hikma's public communications beyond its label and its statement of generic equivalence in association with a broader patient population for the CV indication that it had supposedly carved out. Amarin does not attack the use of a section viii carve-out per se; it argues that multiple suggestions may be enough to encourage infringement in some cases. And at the pleading stage, Amarin has plausible stated a claim for induced infringement based on Hikma's series of suggestions.

## CONCLUSION

The district court's order dismissing Amarin's first amended complaint should be reversed, and the case should be remanded for further proceedings.

Respectfully submitted,

PERKINS COIE LLP

by /s/Nathan K. Kelley
Nathan K. Kelley

*Counsel for Appellants Amarin Pharma, Inc., Amarin Pharmaceuticals Ireland Ltd., and Mochida Pharmaceutical Co., Ltd.*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1169

**Short Case Caption:** Amarin Pharma, Inc. v. Hikma Pharmaceuticals USA Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 5,216 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- [ ] the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 07/12/2023

Signature: /s/Nathan K. Kelley

Name: Nathan K. Kelley